UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CASE NUMBER 1:23-CV-270

FILED
ASHEVILLE, NC

JAN 03 2024

U.S. DISTRICT COURT
W. DISTRICT OF N.C.

MACKENZIE ELAINE BROWN

    Plaintiff

v.

HENDERSON COUNTY SHERIFF'S
OFFICE, et al.

    Defendants

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, Mackenzie Elaine Brown, on this day of JANUARY 3, 2024, hereby submits this Memorandum of Support in Opposition to the Motion to Dismiss for Failure to State a Claim by Defendants Henderson County Sheriff's Office, Robert Warren, Michael Lindsay, Crystal Landers, Johnny Duncan, Jr., Bradley Reese, and Brittany Maybin (collectively, the HCSO Defendants). [Document 15-16].

*Mackenzie Elaine Brown*
MACKENZIE ELAINE BROWN,
PLAINTIFF
PRO SE LITIGANT
158 HAVEN RD, EAST
FLAT ROCK, NC 28726
828-642-0406
mackenzieb0897@gmail.com

**INTRODUCTION**

I, Mackenzie Elaine Brown, as the Pro Se Litigant in this matter, will refer to myself throughout the entirety of this document as either "Plaintiff" or "BROWN."

On November 8th, 2023, The HCSO Defendants filed a Motion to Dismiss for Failure to State a Claim, pursuant to Rule 12(b)(6) of The Federal Rules of Civil Procedure.

As will be demonstrated, the Motion to Dismiss filed by the HCSO Defendants should be denied for several reasons.

First, Plaintiff's complaint contains well-pleaded factual allegations that plausibly give rise to an entitlement to relief. The factual allegations are "plausible" because the court is able to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Second, the Court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

Third, the Court must afford leeway to Pro Se litigants. "The pleadings of pro se litigants are "liberally construed" and held to a less exacting standard as those complaints drafted by attorneys." *Tannenbaum v. United States*, 148 F. 3d 1262, 1263 (11th Cir. 1998).

**A. RESPONSE TO ARGUMENT A**

**[THAT HCSO IS ENTITLED TO DISMISSAL BECAUSE IT'S NOT A SUITABLE ENTITY UNDER NORTH CAROLINA LAW]**

The liability for the HCSO Defendants' wrongdoing against Plaintiff is imputed to their principal and employer, Henderson County Sheriff's Office.

### B. RESPONSE TO ARGUMENT B
**[THAT THE FIRST AMENDMENT RETALIATION CLAIM SHOULD BE DISMISSED]**

The right to free speech is one of the most fundamental guarantees from the Bill of Rights. *See, e.g., Thornhill v. Alabama, 310 U.S. 88, 95 (1940) (The freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgement by a state.").*

The Supreme Court has recognized that the First Amendment's protections extend to individual and collective speech "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984).* Freedom of speech may be exercised in a direct (words) or a symbolic (actions) way.

The right to freedom of speech allows individuals to express themselves without government interference or regulation. The Supreme Court requires the government to provide substantial justification for interference with the right of free speech when it attempts to regulate the content of the speech. Generally, a person cannot be held liable, either criminally or civilly for anything written or spoken about a person or topic,

so long as it is truthful or based on an honest opinion and such statements.

Since speech directed towards law enforcement officers falls within the scope of the First Amendment, retaliatory arrest claims should receive the same special considerations. The arrest should be seen as a content-based regulation that is reviewed with strict scrutiny, and the Court should take into account both the timeliness of the speech and the chilling effect that retaliatory arrests may have. Retaliatory arrests also function as a type of prior restraint. When a person is arrested because of her speech, that arrest prevents any subsequent speech that might have been broadcast.

"Even 'provocative and challenging' speech is protected unless it creates a 'clear and present danger.'" *City of Houston v. Hill.* 482 U.S. 451 (1987). Thus, speech criticizing a police officer does not have to be tactful or even respectful to be protected by the First Amendment.

The 'marketplace of ideas' analogy has become a powerful idea as a theory of free expression. The metaphor has been invoked hundreds if not thousands of times by the Supreme Court and federal judges to oppose censorship and to encourage freedom of thought and expression. Justice Steven Breyer invoked the metaphor in his concurring opinion in Reed v. Town of Gilbert (2015), writing that "whenever government disfavors one kind of speech, it places that speech at a disadvantage, potentially interfering with the free marketplace of ideas and with an individual's ability to express thoughts and ideas that can help that individual determine the kind of society in which he wishes

to live, help shape that society and help define his place within it."

Plaintiff stated in her Complaint, "Henderson County Sheriff's Office (HCSO) were willingly giving the public an open invitation for signage on the pink vehicle as part of their event," and "There were not any rules, regulations, directions, instructions, or clues posted … indicating what the public could, could not, should, or should not write." [Document 1, pg. 9-10].

The phrase "12 SUX" is nothing of a profane or obscene nature, not a phrase that would incite crime or violence, not a phrase tending to corrupt public morals, and not a slogan inimical to the public welfare, so it is therefore evident that by signing the phrase "12 SUX", Plaintiff was engaging in protected First Amendment activity.

Whenever Plaintiff's expression of speech was disfavored by the Defendants, they placed her speech at a disadvantage, diminishing her ability to express her harmless thoughts and ideas freely, so therefore the Defendant's have directly harmed Plaintiff's ability to communicate constitutionally protected speech.

When Defendants WARREN, LINDSAY, and LANDERS, subjected Plaintiff to unreasonable seizure by unlawfully arresting her pursuant to invalid warrants unsupported by probable cause, but yet they did not arrest and/or harass any other person that signed the vehicle, their actions demonstrated retaliation towards Plaintiff as a direct result of viewpoint-based discrimination of her expression of speech.

When Defendant DUNCAN made inaccurate, defamatory, and humiliating statements against Plaintiff by publicizing a false portrayal of her arrest on the HCSO Facebook page and the HCSO mobile app, his actions demonstrated retaliation towards Plaintiff as a direct result of viewpoint-based discrimination of her expression of speech.

When Defendant REESE issued Plaintiff an unnecessarily harsh punishment of a $550 fine for not answering her door the morning after the arrest, his actions demonstrated retaliation towards Plaintiff as a direct result of viewpoint-based discrimination of her expression of speech.

When Defendant MAYBIN used intimidation tactics to interfere with Plaintiff's release from Henderson County Detention Facility, by persuasively coercing bail agencies to not assist Plaintiff in her process of bonding out of jail, her actions demonstrated retaliation towards Plaintiff as a direct result of viewpoint-based discrimination of her expression of speech.

With all of that being said, the actions of Defendants WARREN, LINDSAY, LANDERS, DUNCAN, REESE, and MAYBIN, have deprived Plaintiff of her right to freedom of speech, as guaranteed by the First Amendment to the United States Constitution.

Defendants WARREN, LINDSAY, and LANDERS, arrested Plaintiff for a crime they knew she was innocent of, after they co-conspired together to unlawfully effect a Warrant for Arrest for Plaintiff by initiating a criminal process for Injury to Personal Property, while they each knew the warrant was unsupported by probable cause and was based upon false information.

Probable cause for an arrest "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed … an offense." *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015)

If Defendants WARREN, LINDSAY, and LANDERS erroneously believed that the particular conduct of Plaintiff was criminal when in fact it was not, the presence of probable cause to believe Plaintiff had committed that conduct would not provide probable cause to arrest, so therefore Defendants WARREN, LINDSAY, and LANDERS did not have probable cause to believe, based on the facts known at the time of arrest, that Plaintiff committed, was committing, or was about to commit a crime.

In regards to the District Court conviction establishing probable cause for the arrest, Plaintiff was falsely convicted due to being given an unfair and unjust 'trial by judge' hearing. Judge COWAN demonstrated bias and favoritism towards Deputies WARREN and LINDSAY, ignoring facts that made it obvious Plaintiff was innocent of the alleged crime and maliciously convicting her anyway. Upon Plaintiff's appeal of the conviction, the Injury to Personal Property case was dismissed for NISITP (Not In States Interest To Prosecute), implying Plaintiff's innocence of the alleged crime.

Defendant DUNCAN broadcasted a defamatory and inaccurate portrayal of Plaintiff's arrest on the HCSO Facebook page and the HCSO mobile app, and then those statements became highly publicized on a national level after news outlets republished the posts, totaling at least 21 sources. [Document 1, pg. 12].

Defendant DUNCAN's actions reflect an intentional and callous disregard to Plaintiff's rights, by writing the post in such a manner that targeted, humiliated, shamed, belittled, and defamed her in a false light, with the intent that these statements would subject Plaintiff to ridicule, contempt and disgrace in her means of livelihood.

Defendants stated that "Plaintiff's claim against REESE alleges that he gave her a ticket with excessive fine for having a dangerous dog." [Document 16, Page 10]. However, that statement is false, because Plaintiff stated in the Complaint, "...there was a paper taped to my door with a fine of $550 by Henderson County Sheriff's Department Animal Enforcement Division, who had showed up to my home and did an extremely random and unexpected dangerous dog inspection while I was asleep," and "...told them that a $550 fine seems like such an extreme measure to resort to just for someone not answering their door because they are asleep." [Document 1, pg. 13-14]. It is therefore evident that Plaintiff's allegation against REESE was actually that he gave her a ticket with an excessive fine for not answering her door when he showed up to her home to do a random and unexpected dangerous dog inspection of her property.

The Defendants accused Plaintiff of failing "to allege how Reese's writing her a ticket was related to her writing "12 SUX" on the pink patrol car." [Document 16, Page 10]. However, Plaintiff had stated in the Complaint, "The violation fee from Animal Enforcement would not have been issued to me without the incident of the pink car false arrest happening. It is no coincidence that Defendant REESE showed up the morning after the false arrest with such an unnecessarily harsh punishment for

something that would not have been punished the same way under ordinary circumstances." [Document 1, Page 23].

The Defendants stated that "Plaintiff admits that Reese agreed to take away the $550 charge." [Document 16, Page 10]. However, that statement is not true, because Plaintiff stated in the Complaint, "I made a phone call to Henderson County Animal Enforcement … and I told Animal Enforcement that I was unable to afford the $550 fine," and "We can take away the $550 charge, but we'll have to mark that as your dog's strike 2, and on strike 3, we'll have to put her down." [Document 1, pg. 13-14]. Therefore, by Animal Enforcement only altering the punishment, instead of completely rescinding it, it does not equate to REESE agreeing to take the $550 fine away.

Seeing that Defendant REESE was the Officer responsible for issuing the $550 fine, but the Animal Enforcement Officer on the other end of the phone was not Defendant REESE but rather another unidentified officer, the Defendant's statement that "Plaintiff admits that REESE agreed to take away the $550 charge," is inaccurate for that reason as well.

Defendant MAYBIN took personal interest to impede Plaintiff's release from jail by personally answering the phone or directing another unknown officer to answer it, once the bail agencies were calling the jail about Plaintiff's release, and persuading them to deny assisting Plaintiff through their agencies. Defendant MAYBIN's actions demonstrate retaliation against Plaintiff, because MAYBIN would not have taken these malicious actions against another person under ordinary circumstances.

In regards to the Defendant's statement, "...any act by MAYBIN did not adversely affect Plaintiff's rights…" and "In fact, Plaintiff bonded out less than 3 hours after being admitted into jail," [Document 16, Page 10-11], when taking into consideration that Plaintiff not only was innocent of the crime she was in jail for, but that MAYBIN and the other law enforcement officers involved knew she was innocent yet still took actions to confine her, or prolong her confinement, to jail anyway, it is evident that Plaintiff's right to liberty were in fact adversely affected by MAYBIN.

## C. RESPONSE TO ARGUMENT C
### [THAT THE CONSPIRACY TO VIOLATE PLAINTIFF'S RIGHTS UNDER THE FOURTH AMENDMENT SHOULD BE DISMISSED]

In regards to the Defendants' statement of, "Plaintiff's claim that Warren, Lindsay, and Landers conspired with Magistrate Oates to arrest plaintiff without probable cause should be dismissed because there was probable cause for plaintiff's arrest," [Document 16, Page 11], Plaintiff asks the court to reflect back to her statements made earlier in this document regarding the Defendants' lack of probable cause.

Defendants WARREN, LINDSAY, and LANDERS were each personally involved in the creation or continuation of the unlawful agreement to deprive Plaintiff of her rights, by co-conspiring together to take actions that demonstrated a deliberate and callous disregard for Plaintiff's federally protected rights, and each defendant knew, or in the exercise of due care should have known, that their conduct violated clearly established federal laws.

Defendants WARREN, LINDSAY, and LANDERS also violated Plaintiff's Procedural Due Process rights by interfering with her liberty interest that is detention based on unreasonable seizure.

### D. <u>RESPONSE TO ARGUMENT D</u>
**[THAT THE FOURTH AMENDMENT HARASSING AND INTIMIDATION CLAIM SHOULD BE DISMISSED]**

Conduct considered "harassment" is defined as "a serious act or course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate purpose." Conduct considered "intimidation" is defined as "a serious act or course of conduct directed at a specific person that causes fear or apprehension in such person and serves no legitimate purpose."

The following statements include the chain of events that demonstrate the Defendants' harassing and/or intimidating conduct towards Plaintiff.

The First event in the chain is when Defendants WARREN, LINDSAY, and OATES took actions with malice and improper motive against Plaintiff by initiating a false criminal process against her, and their actions demonstrated intent to deter, impede, prevent, obstruct, hinder or otherwise deny the lawful exercise of rights of Plaintiff.

The Second event in the chain is when Defendants Warren and Landers harassed Plaintiff by arriving at her home to arrest her on a Warrant they knew was based on false allegations, immediately and aggressively handcuffing her without explaining

to her why despite her several attempts to ask them why she was being arrested when she had not broken any laws, accusing her of resisting arrest despite her being very submissive and calm to them, taking pictures of her standing handcuffed in front of the pink sheriff car without her permission, both of them verbally abusing her by calling her things such as "a piece of shit," and then driving her to jail in the back of the pink vehicle in effort to humiliate and punish her, all for simply not agreeing with her protected expression of speech. [Document 1, Page 10].

In addition to all of the above facts, there is an additional factor that shows Defendants WARREN and LANDERS in particular acted in harassing and intimidating manners towards Plaintiff, which is by the fact that during the arrest of Plaintiff in her driveway, there were not just Officers Warren and Landers there at the scene, but in fact several other Henderson County deputies as well. Yet all the other officers were basically just observing Defendants WARREN and LANDERS the entire time, rather than assisting them with the unlawful arrest. [Document 1, Page 10-11]. That being said, Defendants WARREN and LANDERS went out of their way to act in harassing and intimidating ways towards the Plaintiff.

The Third event in the chain is when Defendants LANDERS and MAYBIN verbally abused Plaintiff during her booking process at Henderson County Detention Facility. [Document 1, Page 11].

The Fourth event in the chain is when Defendant MAYBIN took personal interest to impede Plaintiff's release from jail. MAYBIN did this by personally answering the phone or directing another unknown officer to answer it, once the bail agencies were calling the jail about Plaintiff's release, and coercing

and/or persuading multiple bail agencies to deny assisting Plaintiff with her release through their agencies.[Document 1, Page 11].

The Fifth event in the chain is when Defendant DUNCAN made defamatory, derogatory, and humiliating statements about Plaintiff, by publicizing a false portrayal of her arrest on the HCSO Facebook page and the HCSO mobile app, in a context to humiliate and shame her, while purposefully omitting important facts like that HCSO was willingly giving the public an open invitation to sign the vehicle. [Document 1, Page 12].

The Sixth event in the chain is when Defendant REESE harassed Plaintiff Brown by issuing her a $550 fine for not answering her door. The harassment is evident when taking into consideration that REESE fined her less than 24 hours after Plaintiff was falsely arrested, and the fine was an unnecessarily harsh punishment. [Document 1, pg. 13-14].

The Seventh event in the chain is when, about a year after Plaintiff's arrest for Injury to Personal Property, during a court appearance on the matter, the prosecution party used intimidation tactics to attempt to coerce Plaintiff into accepting a deal that would have implied her guilt. Plaintiff's Public Defender (P.D.) informed her that the District Attorney (D.A.) wanted to "...offer you a deal where they'll dismiss the charge if you write an apology letter to the county and do some volunteer hours." Once Plaintiff refused to agree to that, her P.D. told her their new deal offer was that, "You wouldn't have to do any volunteer hours but you would still have to write the apology letter to the county." Again, Plaintiff refused. Then, her P.D. told her that "The prosecution party might try to use

you being a couple minutes late against you." Although none of the Defendants specifically were responsible for those actions, the incident as a whole of the court appearance that day reflected more intimidation and harassment tactics used against Plaintiff, adding to the chain of harassing events. [Document 1, Page 16].

With all of that being said, it is evident that the actions by all of the Defendants taken against Plaintiff clearly establish grounds for patterns of harassment and intimidating conduct, because the Defendants' acts consist of extreme, outrageous, and bullying conduct, and their actions were motivated by spite, evil motive or intent, or involved reckless or callous indifference for Plaintiff's rights.

In regards to the Defendants' statement, "The only arguable Fourth Amendment claim in Plaintiff's Complaint is her false arrest claim. As set forth earlier, there was probable cause for her arrest so this claim should be dismissed," [Document 16, pg. 13], Plaintiff asks the court to reflect back to her statements made earlier in this motion regarding the Defendants' lack of probable cause.

### E. **RESPONSE TO ARGUMENT E**
**[VIOLATION OF THE FIRST AMENDMENT BY PUBLICIZING PLAINTIFF IN FALSE LIGHT]**

In response to the Defendants argument, "posting mugshots does not implicate First Amendment privacy rights," [Document 16, pg. 13], Plaintiff reiterates that the claim against DUNCAN for Violation of the First Amendment by Publicizing Plaintiff in False Light was about the totality of the Facebook post he

published, including the content of the text in the post, not the mugshot images only.

The publication that Defendant DUNCAN posted about Plaintiff consisted not only of her mugshots, but a written portrayal of her arrest that consisted of lies, falsehoods, insults, belittlement, and harassment. This is evident with some examples of what he wrote, such as: "Several hours after unveiling this car… [Plaintiff] … decided it would be a good idea to show her respect by coming to the Sheriff's Office and vandalizing this tribute car." and "Seeing how Mackenzie is such a supporter of our pink patrol car we decided to allow her to be the first person to ride in the back seat of it and we also gave her a complimentary stay in the ole gray bar hotel." and "#PlayStupidGamesWinStupid Prizes #OurSheriffDoesntPlay #NotInHendersonCounty #DontDisrespectThoseWhoHaveFoughtBreastCancer #EnjoyYourVisitBackToJail"." [Document 1, Page 12].

Defendant DUNCAN's statements contained 'calculated falsehoods' and a deliberate and reckless disregard for the truth. His actions would be considered highly offensive to any 'reasonable' person.

F. **RESPONSE TO ARGUMENT F**
**[THAT THE CLAIM THAT REESE HARASSED PLAINTIFF BY GIVING HER AN EXCESSIVE FINE SHOULD BE DISMISSED]**

Animals are considered property in all legal jurisdictions today, and under the Due Process Clause of the Fourteenth Amendment, Plaintiff has a right to not be deprived of life, liberty, or property without due process of law. Plaintiffs

claims that Defendant REESE violated her due process rights should prevail on procedural due process grounds, with respect to her liberty interest.

The Court has explained that [p]procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. *Carey v. Piphus, 435 U.S. 247, 259 (1978).*

To analyze if Plaintiff's Procedural Due Process rights were violated, the Court should decide first, if the Plaintiff has a liberty interest and the Defendants have interfered with that interest, and second, the Court should examine whether the procedures used to deprive Plaintiff of that interest were constitutionally adequate.

Plaintiff would suffer irreparable harm from an erroneous deprivation of her animal, and she has been suffering ever since Defendant REESE put her animal at closer risk to that deprivation, as a way to retaliate against her.

In regards to the Defendant's statement, "as Plaintiff's fine was rescinded, she cannot demonstrate that any claimed liberty or property interest was deprived," [Document 16, pg. 14], Plaintiff asks the court to reflect back to her statements made earlier in this motion regarding that having the punishment only altered, instead of completely rescinded, does not equate to REESE agreeing to take the $550 charge away.

### G. **RESPONSE TO ARGUMENT G**
**[THAT THE CLAIM THAT MAYBIN USED INTIMIDATION TACTICS TO COERCE SURETY COMPANIES SHOULD BE DISMISSED]**

In regards to the Defendant's statement, "the Due Process Clause of the Fourteenth Amendment does not provide an absolute right to be released on bond," [Document 16, pg. 15], the Court has explained that [p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

Freedom from confinement is one aspect of the liberty interest that the Due Process Clause protects. The 'liberty' mentioned in the Fourteenth Amendment means, not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways. *E.g., Allgeyer v. Louisiana*, 165 U.S. 578, 588 (1897).

To analyze if Plaintiff's Procedural Due Process rights were violated, the Court should decide first, if the Plaintiff has a liberty interest and the Defendants have interfered with that interest, and second, the Court should examines whether the procedures used to deprive Plaintiff of that interest were constitutionally adequate.

In regards to the Defendant's statements, "Plaintiff suffered no deprivation of any liberty as she was released less than three hours after she was incarcerated," [Document 16, pg. 15], Plaintiff responds that 3 hours is 3 too many when not only an individual is innocent of the crime she is charged with, but when the law enforcement officers involved, including Defendant

MAYBIN, knew she was innocent the entire time and still took actions to confine her to the jail.

Defendant Maybin told Plaintiff that a bondsman was on the way for her so that she could be released from jail, but a short while later, MAYBIN told Plaintiff that bondsman wasn't coming to release Plaintiff anymore because MAYBIN had communicated with them and told them what she had wrote on the vehicle. [Document 1, Page 11].

The amount of time it would have taken for Plaintiff to be released from custody if MAYBIN hadn't interfered with her bail bond process, compared to the amount of time it did take due to MAYBIN's actions, show that MAYBIN prolonging the release of Plaintiff from jail was a clear unjustified deprivation of her liberty interest of freedom from confinement that the Due Process Clause protects.

### CONCLUSION

For the totality of the reasons stated within this document, and all the other reasons discussed in the Complaint, Plaintiff respectfully requests that the court deny the HCSO Defendants' Motion to Dismiss.

This 3 day of January, 2024

Mackenzie Elaine Brown,
Plaintiff & Pro Se Litigant
158 Haven Rd, East Flat Rock, NC 28726
P: 828-642-0406
E: mackenzieb0897@gmail.com

# **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via USPS mail to the U.S. Clerk of Courts Office, and mailed a copy to the following attorney of the Defendants:

Sean F. Perrin
Womble Bond Dickinson (US) LLP
301 S. College Street, Ste. 3500 Charlotte, North Carolina 28202
Telephone: 704-331-4992
Facsimile: 704-338-7814
Sean.Perrin@wbd-us.com
Attorney for Defendants Henderson County Sheriff's Office, Robert Jordan Warren, Michael Scott Lindsay, Crystal D. Landers, Johnny E. Duncan, Jr., Bradley R. Reese, and Brittany Nicole Maybin

*Mackenzie Elaine Brown*

Dated JANUARY 3, 2024.

Mackenzie Elaine Brown,
Plaintiff & Pro Se Litigant
158 Haven Rd, East Flat
Rock, NC 28726
P: 828-642-0406
E: mackenzieb0897@gmail.com